[No. 15904.   Department One.   October 18, 1920.]

JOSIAS GEORGE, *Appellant*, v. C. E. BINGHAM *et al.*, *Respondents*.[1]

VENDOR AND PURCHASER (60)—RESCISSION BY VENDEE—FALSE REPRESENTATIONS—MATERIALITY—EVIDENCE—SUFFICIENCY. A representation to a purchaser of land that there was an old school house upon it, worth four hundred to five hundred dollars, is not such a representation as to a material fact as to constitute an inducement to the contract which the purchaser could rely upon and be entitled to a rescission for fraud.

SAME (64)—RESCISSION BY VENDEE—ESTOPPEL OR WAIVER. A purchaser of land cannot rescind a contract for false representations as to an old school house thereon, where, after learning that it was not on the land, he indicated his satisfaction with the agreement by offering to complete the contract.

Appeal from a judgment of the superior court for Skagit county, Brawley, J., entered December 2, 1918, upon findings in favor of the defendants, in an action on contract, tried to the court. Affirmed.

[1]Reported in 192 Pac. 980.

*A. R. Hilen* and *R. V. Welts,* for appellant.
*Coleman & Gable,* for respondents Bingham.
*Thomas Smith,* for respondent Seabury.

HOLCOMB, C. J.—Plaintiff, George, brought this action to rescind a contract for the purchase of real estate and recover from C. E. Bingham and wife $500 which George had paid under the contract. Seabury and wife were, by order of the court, brought into the action as parties defendant at the instance of the Binghams. Upon a trial to the court without a jury, the action was dismissed as to defendants Seabury and judgment was entered for defendants Bingham against plaintiff for the remainder of the purchase price under the contract. Plaintiff has appealed.

All the parties to the action were residents of Skagit county when, in the year 1913, Seabury, representing a certain orchard-land company, approached George with a view to selling him some land in Benton county at $75 an acre on monthly payments. George became interested when Seabury stated that he himself had twenty acres of land in the same district (the "Horse Heaven Country") which George might have for $50 an acre, but on terms different from those under which tracts of the orchard-land company were being sold. Seabury testified that he at this time told George that the legal title to this twenty-acre piece of land was in Bingham because Seabury was indebted to him and Bingham was holding the land as collateral; and that George's offer would have to be submitted to Bingham. George was shown photographs of the land and was told that there was on it an old schoolhouse worth about $400 or $500. Such a structure appeared in one of the pictures. Thereafter George signed a contract, dated March 10, 1913, with Bingham and wife, whereby

he agreed to purchase the land for $1,000. This contract acknowledged the receipt of $500 as earnest money, and stipulated that George was to pay the remaining $500 on or before June 1, 1914, with interest at eight per cent per annum, and that he was also to pay all taxes and assessments. George did not, in fact, at once make the payment of $500, receipt of which was acknowledged in the contract, but instead gave two notes of $250 each therefor, for which Seabury, on March 6, 1913, gave him a receipt for "$500 in the form of two notes," stating in such receipts that a contract would thereafter issue from Bingham following the terms of the receipt. The two notes were carried by a bank, the cash being sent to Bingham.

During the winter of 1913 and spring of 1914, there was some correspondence between George and Seabury, apparently arising out of George's dissatisfaction with his bargain. The record does not include any letters written by him to Seabury, but only some written by Seabury, replying and referring to letters received from George, who evidently thought that some one was going to remove, or had already removed, the building which the parties believed to be on the land George was buying. The language of Seabury's letters indicates that George had been writing him to the effect that he had information that the land was worthless; and also indicates that Seabury was making efforts to reassure and satisfy him with the transaction. Apparently George was not altogether satisfied with what he learned from Seabury, for he wrote to some person in Benton county inquiring whether the building was on the land he was buying, and that person referred his letter to the attorneys representing the school district. They, having no reason to believe that the schoolhouse was not on

George's land, and, naturally enough, taking him to be the owner of the land upon which the schoolhouse was situated, wrote to him, stating that the schoolhouse belonged to the school district and had been used by the school district for twenty-eight years, except one year; that an acre of the land had been given to the school district but never put of record; and that, rather than have any trouble with George, the school district would buy an acre of land from him (meaning the acre of land on which the building stood). George claims he did not learn until this time that the building belonged to the school district. His attorneys wrote to Bingham, telling him they had also written to Seabury, suggesting that the matter be straightened out in some way, and they concluded their letter to Bingham with the statement that the money for the last payment under the contract was ready for him if he would send a deed to the land to George's bank at Anacortes, together with an abstract brought down to date, in order that the abstract might be examined before delivery of the deed and money. Bingham accordingly sent the instruments to the bank, but George refused them, and went to Prosser to see the land himself and meet the representatives of the school district. He went on the land in company with the county engineer, who informed him that the schoolhouse was not on his (George's) land, but on adjoining land. Thereafter, June 27, 1914, George wrote Bingham a letter demanding the rescission of the contract and the return of the $500 he had paid thereunder, alleging, as reasons for his demand, that he had been induced to enter into the contract by misrepresentations made by Seabury, as agent for Bingham, to the effect that the land was good land and the schoolhouse was on it, whereas George had learned from personal investigation that five acres

of the land were in a gully and were worthless, and that the schoolhouse, which was worth about $500, was not then, and never had been, on the land sold to him, but was upon adjoining land and belonged to the school district. Bingham refused to rescind the contract and this action resulted.

Appellant makes a number of assignments of error, but discusses them as two questions, substantially as follows: Was appellant so misled by false representations as to entitle him to rescission of the contract? and Can the parties be placed in *statu quo*?

Appellant's grievance was, as he alleged, that he had been misled because Seabury had represented to him that the land was good land, when, in fact, one-fourth of it was in a gully and worthless; and that he was getting the land with a $500 building on it, whereas the truth was that the building was not on the land at all, but on adjoining land and belonged to the school district.

The only evidence as to there being a gully on the land was by appellant himself, and to us it is far from convincing. Our reading of his testimony in this connection has left the impression that appellant must have been mistaken about the gully being on his land, and that he no doubt had reference to a gully which was said to be on the adjoining section.

Whether or not Seabury did, in fact, positively represent that the schoolhouse was on the land, had been abandoned and went with the land or could "be bought for a song," is, as the trial court found, immaterial. That being so, any representation as to the schoolhouse being worth $400 or $450 was equally immaterial. One seeing a schoolhouse on land does not, either reasonably or rightfully, conclude that he can buy such a public improvement with the location

thereof, without dealing with the proper public authority. Nor could an intending purchaser justly assume that a public building, such as a schoolhouse, had been abandoned. No such declaration by a private and unauthorized person could have any binding effect on either without a positive conveyance under warranty.

Appellant cites much respectable authority for the general principle of law that:

". . . all representations which are untrue and which materially affect the value of the property which forms the subject of the contract will furnish grounds for a rescission, even though they may not have been made with a fraudulent intent."

Supplementing the principle cited by the appellant, may be quoted the following:

"But to avoid a contract of sale on the ground of misrepresentation the false statements must have been of some *material fact* constituting an inducement to the contract, and which, having been relied upon, *have operated to the damage or injury of the party who assigns it as a reason for non-performance.*" Warvelle on Vendors, vol. II (2d ed.), § 846, p. 997.

Even assuming that appellant was in fact misled into believing he was to get a $400 or $500 schoolhouse with the land, after he learned that the building belonged to the school district, he was apparently satisfied with his bargain, as shown by our reference to the letter his attorneys wrote to Bingham, telling him to send a deed and abstract in return for the last payment under the contract; indicating that appellant had obtained substantially what he had bargained for.

The trial court found, upon conflicting evidence, that there had been no misrepresentations as to the value of the land itself.

Not being able to find that the evidence upon any

matter at issue preponderates against the findings of the trial court, the judgment is affirmed.

MAIN, TOLMAN, MITCHELL, and MACKINTOSH, JJ., concur.